

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 17 2004

JAMES W. McCORMACK, CLERK
By:_____
                  DEP CLERK

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 03-1073

4:99 CV 01308

| | |
|---|---|
| In re: Aircraft Accident at Little Rock, Arkansas on June 1, 1999. | |
| ---------------------- | |
| Steering Committee, Consisting of Nancy Chu, Jimmy Manus and Stephanie Manus (individually and as next friends of Emily Manus and Lauren Manus, minors), Joe Rustenhaven (husband) and Mary Rustenhaven (wife), | Appeal from United States District Court for the Eastern District of Arkansas. |
| Appellant, | |
| v. | |
| American Airlines, Inc., | |
| Appellee. | |

Submitted: September 8, 2003

Filed: December 16, 2003

Before MORRIS SHEPPARD ARNOLD, BEAM, and BYE, Circuit Judges.

166

MORRIS SHEPPARD ARNOLD, Circuit Judge.

I.

An American Airlines jet aircraft, being operated as Flight 1420 from Dallas/Fort Worth to Little Rock, crashed into a non-frangible approach light stanchion after touching down, broke apart, and caught fire. Eleven people died and more than eighty were injured as a result of the accident.

Various federal lawsuits relating to the crash were filed; they were consolidated by the Judicial Panel on Multi-District Litigation and transferred to the United States District Court for the Eastern District of Arkansas. A plaintiffs' steering committee (PSC) was appointed to be responsible for the litigation of questions of fact and law that were common to all cases. The compensatory damages claims were separated from the punitive damages claims, and the cases at issue in this appeal were tried to a jury on the issue of compensatory damages. The district court[1] then granted American Airlines's motion for summary judgment dismissing the plaintiffs' claims for punitive damages. *See In re Aircraft Accident at Little Rock, Ark., June 1, 1999*, 231 F. Supp. 2d 852 (E.D. Ark. 2002). The sole issue in this appeal is whether the district court erred in granting that motion.

We review the district court's grant of summary judgment *de novo*. *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1006 (8th Cir. 2002). We view the evidence and the inferences that may be reasonably drawn from it in a light most favorable to the PSC. *See Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir. 1999). Summary judgment was properly granted only if the evidence was such that no reasonable jury could have found grounds for awarding punitive damages under the standard established by Arkansas law. *See id.* at 935.

---

[1] The Honorable Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

According to the PSC, the conduct justifying punitive damages was committed by the two members of the flight crew, Captain Richard Buschmann and First Officer Michael Origel. While the defendant in this case is American Airlines, Inc., under Arkansas law a corporation is liable for punitive damages for such acts of its agents acting within the scope of their employment as would render the agents themselves liable for such damages. *See Miller v. Blanton*, 213 Ark. 246, 251-53, 210 S.W.2d 293, 296-97 (1948). The parties agree that Captain Buschmann and First Officer Origel were acting within the scope of their employment on the night of the crash, and the issue is thus whether the behavior of these men leading up to and resulting in the crash could justify an award of punitive damages.

## II.

Because punitive damages "are not a favorite of the law" in Arkansas, *Diamond Shamrock Corp. v. Phillips*, 256 Ark. 886, 892, 511 S.W.2d 160, 164 (1974) (internal quotations omitted), significant limits are placed on their award. As relevant here, punitive damages may be imposed only if a defendant acts with a sufficient degree of willfulness, wantonness, or conscious indifference to consequences that malice can be inferred. It is clear that negligence alone, however gross, is not sufficient to sustain a punitive damages award. *See Louisiana and North West R.R. Co. v. Willis*, 289 Ark. 410, 415, 711 S.W.2d 805, 808 (1986). The Arkansas Supreme Court has used varying language to describe the required disposition or state of mind. Each party here emphasizes distinct formulations from different Arkansas cases. American Airlines contends that evidence of even a scintilla of care exhibited by the flight crew necessarily defeats a punitive damages claim, but the PSC contends that punitive damages may be awarded even when there was not an "absence of all care."

The Arkansas Supreme Court, in *D'Arbonne Const. Co. v. Foster*, No. 02-1365, 2003 WL 22311171 (Ark. Oct. 9, 2003), recently explained the standard for determining the propriety of a punitive damages award as follows:

> This court has said that an award of punitive damages is justified only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred. In other words, in order to superadd this element of damages by way of punishment, it must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred. In order to warrant a submission of the question of punitive damages, there must be an element of willfulness or such reckless conduct on the part of the defendant as is equivalent thereto.

(Citations omitted.) Later in the opinion, the court summarized the standard slightly differently, stating:

> Evidence is sufficient to support punitive damages if the party against whom such damages may be assessed, knew or ought to have known, in light of the surrounding circumstances, that the party's conduct would naturally and probably result in injury and that party continued such conduct in reckless disregard of the circumstances from which malice may be inferred.

American Airlines contends that one of the requirements for submitting a punitive damages claim to a jury is that the defendant acted with an "absence of all care." The Arkansas Supreme Court has indeed used this language in two cases holding that punitive damages were not justified. In *National By-Products, Inc. v. Searcy House Moving Co.*, 292 Ark. 491, 731 S.W.2d 194 (1987), which is cited in *D'Arbonne*, the Arkansas Supreme Court, vacating an award of punitive damages, stated that "[a]n award of punitive damages is justified only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred," and immediately thereafter provided the following definition of "wantonness and conscious indifference to the consequences":

> "Wantonness is essentially an attitude of mind and imparts to an act of misconduct a tortious character, such conduct as manifests a disposition of perversity. Such a disposition or mental state is shown by a person, when, notwithstanding his conscious and timely knowledge of an approach to an unusual danger and of common probability of injury to others, he proceeds into the presence of danger, *with indifference to consequences and with absence of all care*. ... It is not necessary to prove that the defendant deliberately intended to injure the plaintiff. It is enough if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequence of his act was injury to the plaintiff."

*Id.* at 493-94, 731 S.W.2d at 195-96 (emphasis added) (quoting *Ellis v. Ferguson*, 238 Ark. 776, 778-79, 385 S.W.2d 154, 155 (1964) (internal quotations omitted). The Arkansas Supreme Court quoted and applied this passage later the same year in *Alpha Zeta Chapter of Pi Kappa Alpha Fraternity v. Sullivan*, 293 Ark. 576, 586-87, 740 S.W. 2d 127, 132-33 (1987), which held that the defendant driver of a truck was not guilty of such willful and wanton disregard for his passengers' safety as to warrant a punitive damages award.

The PSC contends that the discussion of an "absence of all care" in these two cases is aberrational, or is merely dictum or constitutes a caveat, and notes that the phrase has not been used by the Arkansas Supreme Court since it appeared in these two cases in 1987, and that it does not appear in Arkansas's model jury instructions. The PSC contends that recent Arkansas cases have found punitive damages to be justified despite the existence of evidence that the defendants exhibited at least some care.

It is unclear to us whether the passage appearing in *National By-Products* and *Sullivan* means that the requirement in *D'Arbonne* that a defendant have acted "wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred" is necessarily inconsistent with evidence

-5-

that a defendant exhibited some minimal degree of care. Either wantonness or conscious indifference to the consequences is sufficient to grant an award of punitive damages under the *D'Arbonne* standard, but we are uncertain whether the Arkansas Supreme Court's earlier references to an "absence of all care" related to wantonness, conscious indifference to the consequences, both, or some other mental state that is no longer part of the punitive damages inquiry. In addition, neither *National By-Products* nor *Sullivan* clarifies whether acting with an "absence of all care" is merely an illustrative example of the requisite disposition or whether an "absence of all care" is a requirement for awarding punitive damages. The language associating an "absence of all care" with "wantonness and conscious indifference to the consequences" has neither been expressly repudiated by Arkansas courts nor has it appeared in the Arkansas Supreme Court's most recent discussion of the requirements for awarding punitive damages.

We assume for the sake of argument that a defendant's "absence of all care" is not an outright requirement for a punitive damages award in Arkansas. Reviewing *de novo* the district court's decision to grant American Airlines's motion for summary judgment dismissing the punitive damage claims, in accordance with the Arkansas Supreme Court's most recent formulation of the standard in *D'Arbonne*, we hold that the PSC has not presented substantial evidence from which a reasonable jury could find that American Airlines or its agents acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred. Stated differently, we hold that no reasonable jury could find on the record below that the members of the flight crew knew, or ought to have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury and that they continued such conduct in reckless disregard of the circumstances from which malice may be inferred.

III.

The district court comprehensively detailed the events leading up to the crash. *See In re Aircraft Accident*, 231 F. Supp. 2d at 858-72. A brief summary will suffice here. Prior to takeoff, William Trott (American Airlines's flight dispatcher for Flight 1420) provided a report to the flight crew that indicated a possibility of thunderstorms in the vicinity of Little Rock at the flight's estimated time of arrival. The flight crew discussed the weather reports and the possibility of landing at an alternate airport if the need arose. Captain Buschmann signed the flight plan, thereby acknowledging the weather conditions.

One minute after the flight took off from Dallas/Fort Worth, Mr. Trott sent a message to the flight crew stating that there were thunderstorms in the vicinity of the Little Rock airport but that a "large slot" or "bowling alley approach" clear of storms existed from Dallas to Little Rock, and suggesting that the arrival should be expedited "in order to beat the [thunderstorms] to LIT if [possible]." A few minutes later still, the flight crew requested updated Little Rock weather information, at which time they were provided with the same report they received prior to departure. Within a short time thereafter, a weather advisory issued by the National Weather Service was broadcast by the FAA's Fort Worth air route traffic control center, forecasting severe thunderstorms, hail and high gusting winds for portions of Arkansas and Oklahoma, with Little Rock on the eastern edge of the affected area.

The flight crew continued to monitor and discuss the weather conditions, and planned their descent into Little Rock, notifying the passengers over the public address system that they were eighty miles from the airport and had started their descent toward it. Captain Buschmann, observing the weather conditions, told First Officer Origel, "We gotta get there quick," and First Officer Origel agreed. The flight crew began performing parts of the "before landing" checklist. They then observed lightning, but concluded that everything was "cool" and that "we're gonna be okay," and discussed flying "down the bowling alley." The Little Rock air traffic controller

informed the flight crew that there was "a thunderstorm just northwest of the airport moving uh, through the area now," and gave them data on the wind speed and direction at the Little Rock airport. The flight crew made some calculations attempting to discern whether the crosswind characteristics were within American Airlines's limits, and chose to continue their descent. Due to low-level clouds interfering with the visibility of the airport, the flight crew decided to conduct an instrument approach to the runway.

The controller then reported a "windshear alert" to the flight crew (windshear consists of rapidly changing wind currents and, according to the Aeronautical Information Manual, can be hazardous to aircraft operations at low altitudes on approach to airports). In response to the windshear alert, Captain Buschmann, concluding that landing on Runway 22L as planned would entail landing with a tailwind, requested a change to Runway 4R, which would allow the aircraft to land with a headwind. The controller granted the request, and the aircraft circled back around the airport, adding five minutes to the flight time, in order to line up with the new runway. When the controller issued a wind report of 350 degrees at 30 knots with gusts to 45 knots, First Officer Origel read the wind report back as 030 degrees at 45 knots, and thus was apparently mistaken in the wind direction by 40 degrees. The flight crew began to reconfigure the aircraft for landing by lowering the wing flaps and activating the landing gear. The controller then issued a second windshear alert, in response to which the flight crew made certain adjustments to account for the gusting winds and continued their descent.

One minute before landing, Captain Buschmann observed that the situation was "a can of worms." The flight crew then discussed how they were "way off course," as the aircraft had drifted away from the runway's centerline due to a crosswind. The crew managed to realign the aircraft, though, and touched down on the runway just to the right of the centerline in a slight left "crab" position. The crew had difficulty

slowing and controlling the aircraft, and the plane hydroplaned off the runway, crashed into a light stanchion, and broke apart.

Following the accident, investigators found that the aircraft's spoilers had not been deployed during the landing. Spoilers reduce the wings' aerodynamic lift by disrupting the smooth flow of air over the wings and, when deployed in a landing, transfer the aircraft's weight to the landing gear thereby improving braking ability and decreasing stopping distance. They can either be armed during the flight to deploy automatically upon landing, or they can be deployed manually once on the ground. The flight crew's failure to deploy the spoilers violated American Airlines's procedures, which require flight crews to arm the spoilers to deploy automatically upon landing and, if the spoilers fail to deploy automatically, to deploy them manually. Significantly, the district court found, based on the testimony of American Airlines's experts and reports by the National Transportation Safety Board and Boeing, that had the spoilers been deployed (either automatically or manually), the aircraft would have stopped on the runway and the accident would not have occurred. This finding is not disputed by the PSC, and we therefore accept it as true.

IV.

We agree with the district court that the only conduct that might support an award of punitive damages was that of Captain Buschmann and First Officer Origel in the last sixteen minutes of the flight, that is, their conduct beginning with the decision to continue the approach into Little Rock after the air traffic controller there confirmed that a thunderstorm had hit the airport. Before then, the flight crew, having notice of the possible inclement weather in Little Rock, took an uncontroversial "wait-and-see" attitude to landing, having the ability at any time to divert the aircraft's course to Nashville or another alternate location. The decision to take off, and the conduct during the flight up to this time, cannot reasonably be deemed negligent, let alone sufficiently reckless to justify a punitive damages award.

The parties dispute whether the evidence is such that a reasonable jury could find that the disposition or mental state of one or both members of the flight crew had a degree of willfulness, wantonness, or conscious indifference to the risk that the crew would crash the aircraft due to the inclement weather sufficient to allow an inference of malice. American Airlines contends that, because the crash would not have occurred had the spoilers been activated, the proper inquiry is whether the failure to deploy the spoilers was itself the product of the type of mental state justifying punitive damages. The PSC, however, contends that this inquiry is too narrow, and that the decision to proceed with the landing in inclement weather was itself a proximate cause of the crash because the events leading up to the crash were cumulative in nature. According to the PSC's theory, a reasonable jury could find that the flight crew neglected to deploy the spoilers because they became distracted and had too much to do as a result of their egregious decision to land the aircraft in the inclement weather.

The evidence provides no clear explanation for why the flight crew failed to deploy the spoilers. We agree with the PSC, though, that a reasonable jury could find that the flight crew's decision to land the plane during conditions of high winds and low visibility led to a situation in which they were distracted from deploying the spoilers. "Causation is ordinarily a fact question for the jury to decide," *Arthur v. Zearley*, 337 Ark. 125, 135, 992 S.W.2d 67, 73 (1999), and a reasonable jury could find that the proximate cause of the failure to deploy the spoilers (and thus the crash) was the decision to land the plane during bad weather. Thus, the punitive damages claim should be submitted to a jury if there is evidence from which a reasonable jury could conclude that the flight crew's decision to land the aircraft satisfied the requirements for awarding punitive damages. Our reading of the record leads us to conclude that it will not support that conclusion.

We agree with the district court that "a jury could certainly find that the crew was, under the circumstances, negligent or even grossly negligent in continuing its

approach" to the Little Rock airport after the air traffic controller there confirmed to them that a thunderstorm had hit the airport. *See In re Aircraft Accident*, 231 F. Supp. 2d at 878-79. The PSC argues that the boundary between gross negligence and willful and wanton conduct is indistinct, and that refusing to let a jury decide which side of the blurry line the flight crew's conduct falls on would violate the plaintiffs' seventh amendment right to a trial by jury. The Arkansas Supreme Court has in fact observed that "the difference between gross negligence and wilful and wanton misconduct is so narrow and indistinct that in many instances the question is one for the jury whether the negligence had become wilful and wanton." *Froman v. J.R. Kelley Stave & Heading Co.*, 196 Ark. 808, 815, 120 S.W.2d 164, 167 (1938). The instant case, however, is not such a case.

No matter how negligent the flight crew's decision to land into the weather that they encountered in Little Rock may have been, it is clear from the transcript of the cockpit voice recorder that Captain Buschmann and First Officer Origel were consistently guided by a motivation to avoid dangerous weather conditions and land the aircraft safely. Rather than exhibiting a "conscious indifference" to or "reckless disregard" of the risks they faced in landing the aircraft, the crew frequently considered the various circumstances and made choices. In the process of landing the aircraft, they made several affirmative, conscious decisions aimed at increasing the likelihood of a safe landing. For example, they switched from a visual to an instrument approach, they changed runways so that they could land with a headwind rather than a tailwind, they attempted a "crab" landing to diminish the effects of the wind further, and they (unsuccessfully) strove to stop the aircraft on the runway. While the wisdom of the decision to land has been called into question by some experts, it is clear that the flight crew was aware of weather-related risks and, rather than exhibiting conscious indifference to or recklessly disregarding such risks, was actively making choices, and exhibiting some level of care, with the apparent motivation of lessening risk and protecting the physical well-being of themselves and the passengers on board the aircraft.

V.

Even assuming arguendo that the flight crew's decision to land was a product of the requisite degree of willfulness, wantonness, or conscious indifference to the consequences for awarding punitive damages, the evidence does not support the contention that the flight crew "knew, or ought to have known" that flying into this weather would "naturally and probably result in injury." Punitive damages are an exceptional type of sanction reserved solely for those activities that not only are risky, but create a level of danger or risk that exceeds a certain threshold level. Under the Arkansas punitive damages standard, a defendant's mental state, no matter how perverse, does not warrant a punitive damages award unless it is associated with a type of conduct that would "naturally and probably result in injury."

This is not an insignificant requirement under Arkansas law. For instance, in *National By-Products*, a collision case, a truck driver who "knowingly [drove] an overloaded 18-wheeler, with defective brakes, on the highway at speeds of 70 m.p.h. by some accounts, oblivious of warning signals and without slowing down and with no apparent effort at stopping, approaching congestion on the highway," 292 Ark. at 497, 731 S.W.2d at 197 (Hays, J., dissenting), was found not to have "intentionally acted in such a way that the natural and probable consequence was to damage appellee's property," 292 Ark. at 495, 731 S.W.2d at 196. Even though the flight crew's actions violated rules and regulations promulgated by both the FAA and American Airlines, punitive damages may not be awarded without sufficient evidence that those actions would naturally and probably result in injury. We think that it is impermissible to infer from the simple fact that the flight crew's conduct *did* result in injury that injury was the *natural and probable* consequence of that conduct.

Some experts testified that they personally would have abandoned the approach and that landing in the weather conditions that prevailed entailed some degree of risk. Nobody testified, however, that an aircraft landing in such conditions would "naturally and probably" crash. It is undisputed that the aircraft would not have

crashed, regardless of the weather, if the flight crew had deployed the spoilers. While distraction resulting from the decision to fly into bad weather may have been the proximate cause of the failure to deploy the spoilers (and thus the crash), it can hardly be said that the failure to deploy the spoilers was the natural and probable result of the decision to fly into the thunderstorm. There is no evidence in the summary judgment record that an expected result of an aircraft flying into the type of weather that Flight 1420 encountered is that the flight crew will naturally and probably neglect to deploy the spoilers.

## VI.

In sum, we believe that no reasonable jury could find either that malice could be inferred from the conduct of the flight crew in the course of landing the aircraft, or that the flight crew's decision to land the aircraft in the weather they encountered was one that would naturally and probably cause the aircraft to crash. We thus affirm the district court's order dismissing the punitive damages claims.